UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| LISA HAMMOCK, | ) |
| Plaintiff, | ) |
| vs. | ) CV 01-BU-1389-M |
| NEXCEL SYNTHETICS, INC., | ) |
| Defendant. | ) |

**ENTERED**
MAY 13 2002

## MEMORANDUM OPINION

This case is presently before the Court on Defendant's motion for summary judgment. Doc. 16. Plaintiff Lisa Hammock claims that Defendant Nexcel Synthetics, Inc., her former employer, discriminated and/or retaliated against her with regard to pay, demotion, termination, and "terms and conditions" of her employment in violation of Title VII and the Equal Pay Act. Based on the Court's review of the record and for the reasons set forth below, Defendants' motion for summary judgment (Doc. 16) is due to be granted in part and denied in part.

I.  **SUMMARY JUDGMENT STANDARD**

On a motion for summary judgment, the Court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106



S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in favor of the non-moving party; it is appropriate only if the Court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553; *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). As to issues that the nonmoving party has the burden of proof at trial, the moving party may discharge its initial burden by either presenting affirmative evidence negating an element of the nonmoving party's claim or demonstrating an absence of evidence to support the nonmoving party's claim. *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). However, when the moving party has the burden of proof at trial, it must show "affirmatively the absence of a genuine issue of material fact;" that is, "the moving party must show that, on all the essential elements of its case on which it bears the

burden of proof at trial, no reasonable jury could find for the nonmoving party." *Id.* at 1438-39 (internal quotations and citations omitted).

Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II. **STATEMENT OF FACTS**

Plaintiff Lisa Hammock began working for Fibre South as a quality control operator in 1990. After approximately three or four months of working as an operator, Hammock was promoted to supervisor over the Quality Control Department. As a supervisor for Fibre South, Plaintiff had supervised five employees and had been responsible for customer service, product quality, production accountability, and process control. She held the supervisory position at Fibre South for approximately four years. She left Fibre South in 1994 to start her own commercial and residential cleaning business. She returned to Fibre South in

1996 as a Quality Control operator; she held this position when Defendant Nexcel purchased Fibre South. Hammock's initial pay with Defendant was $9.00 per hour.

Defendant manufactures thin fibers of yarn from polypropylene pellets using extrusion machines, which melt the pellets into a sheet, which is cut into individual strands. These strands are rolled onto a spool for weaving in the beaming area and the spooled strands are woven into fabric for such things as carpet backing.

In approximately June 1998, Defendant promoted Plaintiff to supervisor on the night shift. Prior to this promotion, Defendant had given Plaintiff a written warning regarding her attendance. When Hammock became a supervisor on the night shift, her pay increased from $9.25 per hour to $27,040 per year. At the same time that Hammock became a supervisor on the night shift, Defendant also made Jeff Wilbanks a supervisor on the night shift. Defendant raised Wilbanks's pay from $13.50 per hour to $33,280 per year. Wilbanks and Plaintiff have the same job responsibilities. The record indicates that the salaries of Plaintiff and Wilbanks as supervisors were established by taking their average hourly pay for a week and adding "10 percent or so." Doc. 18, Exh. 3, p. 67.

Wilbanks had more experience than Plaintiff; he had ten years experience at Synthetic Industries – five years extrusion experience and five years weaving experience. Plaintiff had no prior weaving experience.

Wilbanks was removed from the supervisory position to an hourly position. Reddy testified that Wilbanks spent most of his time repairing and starting the looms and he did not have "the best people skills." *Id.*, Exh. 2, pp. 40-41. When Wilbanks returned to an hourly position, Defendant did not reduce his rate of pay.

Prior to becoming a supervisor, Plaintiff interviewed with Gaines Nichols, then the plant manager, and Brad Cescutti, the project manager. During this interview, Cescutti and Gaines told Plaintiff that they were impressed with her knowledge of the machines and her ambition. Also, before Defendant promoted her, Plaintiff had met with Rom Reddy, Defendant's Chief Executive Officer.

As a supervisor, Plaintiff's job responsibilities included supervising extrusion, weaving, spinning, and carding. In part, this entailed ensuring that employees were there to do their job and that they had what they needed to do their job. As a shift supervisor, Hammock was responsible for all aspects of production. She was responsible for making sure the resin was in house and the right melt. She was also responsible for overseeing the maintenance on the machines that operated on her shifts, for keeping the plant clean, and for achieving production goals. According to Nichols, Hammock was a very high level performer. Nichols testified that at one time, Hammock had held every production record that Defendant kept.

In January, 1999, Defendant moved Plaintiff to a senior supervisor position on the day shift and her salary was increased to $30,040. As supervisor on the day

shift, she was responsible for supervising the A and B shifts and Johnny Keel, a male supervisor, was responsible for supervising the C and D shifts. In approximately August 1999, Defendant increased Plaintiff's salary to $33,000 per year. At this time, Keel's salary was $37,000 per year.

Keel had worked as a plant electrician and manufacturing supervisor since 1992. Defendant hired Keel as the maintenance manager and his rate of pay was based, in part, on his maintenance experience. Defendant contends that he only worked as a shift supervisor on a special temporary assignment.

During the last week of January 2000, Plaintiff met with Reddy, and he told her that he wanted to put her back on night shift. He told her that there was not enough supervision on the night shift and that she could help the night shift because it was "sucking wind." So, in early February 2000, Plaintiff went back to the night shift to become the night shift plant manager. Reddy told her that she was responsible for the entire night shift and that employees on her shift should consult her before consulting Ronnie Lewis, then the plant manager, because he would be busy supervising the day shift.

From February to August 2000, Hammock was the night shift plant manager. As night shift plant manager, she handled everything that occurred on the night shift and was on call seven days a week. During the period of time she was night shift plant manager, she filled in for Lewis as plant manager on two occasions for

approximately two weeks, once in April 2000, when he was away with his father who was ill, and once in July or August 2000, when he took a week of vacation.

In August 2000, Lewis told Hammock that they were going to hire two more supervisors and that he wanted to bring her back to the day shift. Subsequently, Defendant hired two new supervisors, Chad Smith and Jim Brogden. Initially, Defendant paid Smith $37,500 per year; Brogden was paid less than Plaintiff.

Plaintiff helped train Brogden and Smith. After about three weeks of training, Brogden and Smith went to the night shift as junior supervisors.

Smith has a bachelor's degree from Troy State University; Defendant contends that Smith was paid more than Plaintiff because he has a college degree. Also, Smith had ten years of experience with Russell Corporation at the time Defendant hired him. This experience consisted of monitoring and maintaining the air conditioning and water systems at Russell's Cossa River Facility.

In approximately April 2000, Lewis called Plaintiff and told her that one of the employees, Renwick Curry, had been drinking and that when he came in, she should speak to him. Plaintiff did as requested and while she was talking to Curry, Lewis came into the office and told Plaintiff to go find Mike Love. Plaintiff found Love, an hourly male employee, and brought him to the office. Lewis told Plaintiff to leave the office so that he could handle the situation with Love as his witness. After Lewis finished with Curry, Plaintiff asked him what had occurred, and Lewis stated, "God,

dealing with him is like dealing with a bitchy woman." Doc. 18, Exh. 1, p. 156. Lewis assured Plaintiff that he was not talking about her because she was "about half man." *Id.* Plaintiff was insulted by Lewis's comments and his refusal to let her handle the matter with Curry; she told Lewis that she could take care of situations that arose on her shift.

Approximately two weeks later, Plaintiff had a conversation with Reddy and Lewis about the incident with Curry. Plaintiff told Reddy that she was offended by the way that Lewis had handled the situation and that she believed that Lewis did not think she could handle the physical, mental, and emotional aspects of her job. She told Reddy that she felt demeaned by Lewis's handling of the matter and that she believed that Lewis acted in the way he did because she is a woman. She also told Reddy that she had spoken to Lewis on several occasions about receiving a raise as her responsibilities increased and that he constantly ignored her. During this meeting, Lewis responded that he chose to handle the Curry situation instead of letting Plaintiff handle it because he was raised to protect women.

Plaintiff testified that Lewis had referred to complaints from female employees as "bitching, moaning, and groaning." *Id.* at 143-44. Several times he referred to female employees' complaints or comments as "bitching" and/or "whining." *Id.* at 144-51. Plaintiff testified that Lewis had stated that he did not want to hire any more women to work in the extrusion department because they could not handle the job;

also, he started to transfer women in extrusion to other departments. When Lewis made this statement to Reddy, Reddy replied that if women could not handle the job then they did not need to be hired.

Prior to this discussion with Reddy, Plaintiff had become aware that there were several men making more money than her, including Donald Bendell who was not a supervisor. Defendant hired Bendell in October 1998 "with the hope that, with his experience and knowledge in weaving, he could develop into a department manager over the weaving area." Doc. 24, p. 5. Bendell's starting salary was $45,000 per year. Prior to Defendant hiring him, Bendell had worked with Reddy and he had over 15 years of experience. Bendell worked for Defendant primarily as a technician, and he never worked as a full-time supervisor. When Bendell worked as a technician on the shift that Plaintiff supervised, she often gave him job assignments. Bendell left Defendant for personal reasons and never worked as a full-time supervisor or a department manager.

In July 2000, Plaintiff told Reddy that she believed that she was not given a raise to a level commensurate to these men because she was a woman. She also complained about Lewis's offensive conduct toward her as a woman. Approximately a month or two before this meeting, Plaintiff complained to Lewis that she was not being given a raise because she was female. Moreover, during this meeting, after Plaintiff complained that she believed she had not received a raise

because she is a female, Lewis pulled out a calendar and told Reddy that he had some issues with Plaintiff's attendance. This was the first time that Plaintiff was aware that Lewis had any concerns about her attendance. Defendant does not have an attendance policy applicable to its salaried employees. Moreover, attendance records for salaried employees are not kept in the regular course of business.

In addition to the salaries set forth above, Defendant paid other male supervisors substantially more money than Plaintiff -- Defendant initially paid Ronnie Lewis a salary of $49,000 per year and Jack Thompson an initial salary of $48,000 per year.

Ronnie Lewis, who worked as a supervisor before Defendant elevated him to plant manager, does not have a high school diploma, but he has 20 years of relevant experience as a technician and supervisor. He had been the supervisor of weaving at Synthetic Industries from 1987 until 1998, when he went to work for Defendant.

Jack Thompson also had worked for Synthetic Industries; he worked for Synthetic for ten years in process engineering. Defendant hired him in November 1999 as an engineering resource.

Nichols testified that he knows of no reason why in November 1999, when Lewis, Thompson, Wilbanks, and Plaintiff were supervisors that Plaintiff's pay should have been lower than any of the males' pay. Moreover, according to Nichols when the weaving business was up and running, Plaintiff, Hammock, Thompson, Lewis,

and Wilbanks all held the same job title as supervisor and their responsibilities were roughly the same. In fact, Thompson and Plaintiff, who were supervising the operation of the same machines, had more employees reporting to them than Lewis and Wilbanks. Moreover, Lewis testified in his deposition that he could not explain why, at the time Plaintiff was discharged, she was still earning less than all of the male supervisors.

On October 30, 2000, Plaintiff met with Lewis and Melva Tate, the Director of Human Resources. The first thing that Lewis said to Plaintiff was that he was terminating her because of her attendance. During this meeting, Lewis reminded Plaintiff of a conversation they had on September 22, 2000, about arriving at work at 5:30 a.m. Tate told Plaintiff that Defendant's expectations for supervisors were higher than those for hourly employees and that supervisors were supposed to set an example regarding attendance for hourly employees. Lewis told Plaintiff that he had asked supervisors and employees to provide him with information regarding her attendance. Shortly before the end of the meeting, Lewis told Plaintiff that Defendant was offering her an hourly position in beaming at $11.00 per hour, in lieu of termination. Plaintiff refused the demotion to the hourly position and Defendant terminated her effective October 31, 2000.

Plaintiff testified that she did not accept the hourly position because of the substantial reduction in pay and responsibility. Also, she testified that she was

humiliated to be offered an hourly position with substantially fewer responsibilities than her supervisor position, and such position required her to work with employees whom she had supervised. Furthermore, Plaintiff testified she believed that, if she accepted the position, Lewis would just find another baseless reason to terminate her.

According to Lewis, on September 22, 2000, he had a meeting with Hammock in which he discussed her absenteeism and tardiness. However, Plaintiff testified that, at this meeting, Lewis said only that she needed to be at work at 5:30 a.m. to take over the shift. Lewis wrote a memo to Plaintiff's personnel file that stated he had shown Plaintiff the memo and had explained to her that, even though all her absences were excused, she needed to lead by example so that her employees would follow the attendance policy. In his deposition, Lewis admitted that he did not show this memo to Plaintiff and that he had not given her a chance to read and sign it. Lewis testified that, despite the fact that Defendant does not usually maintain a record of supervisor's absenteeism, he began keeping a written record of Plaintiff's attendance. Lewis also admitted in his deposition that there were occasions that Plaintiff had worked late on the night shift when she would call him and inform him that she would be late the following morning. Lewis has no record of when Plaintiff had called to tell him that she would be late because she had to work additional

hours on the night shift. On these occasions, Plaintiff received permission from Lewis to arrive late the following morning.

Defendant had no complaints about Plaintiff's job performance. She did a good job and she was good at motivating her employees to perform to expectations during the entire time she worked for Defendant. Plaintiff's production numbers were good, and, as stated above, Plaintiff held all production records. Lewis testified that her attendance affected her production numbers; however, he stated later that he was not sure whether her production numbers actually were affected.

Plaintiff was replaced by Chad Smith, then the junior night-shift supervisor. After Plaintiff left her position, all Defendant's supervisors were men.

### III.   DISCUSSION

#### A.   PAY CLAIMS

Plaintiff contends that Defendant intentionally discriminated against her by paying her less than similarly-situated male employees. "Gender-based discrimination in rates of pay to employees . . . is prohibited by both the Equal Pay Act . . . as well as by Title VII . . . ." *Miranda v. B & B Cash Grocery Store*, 975 F.2d 1518, 1526 (11th Cir. 1992)(footnotes added). The Eleventh Circuit has explained the basic differences between the proof that is required to prevail under each of the two laws:

> A plaintiff suing under the [EPA] must meet the fairly strict standard of proving that she performed substantially similar work for less pay. The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute. Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex . . . ."

*Id.* (footnote omitted).

### 1. TITLE VII

Plaintiff attempts to prove her Title VII pay claim by use of circumstantial evidence, which brings the *McDonnell Douglas* burden-shifting framework into play. *Miranda*, 975 F.2d at 1528. That is, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. Defendant then has a burden of producing evidence sufficient to indicate that it made the employment decision in question for a legitimate, non-discriminatory reason. If Defendant satisfies this burden, Plaintiff must prove that the legitimate reason has been offered as a mere pretext for discrimination. *See id.* "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1029 (11th Cir. 2000)(citing *Alexander v.*

*Fulton County*, 207 F.3d 1303, 1341 (11th Cir.2000); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1541-43 (11th Cir. 1997)).

Plaintiff contends that Defendant paid her less than other male supervisors because of her gender. Specifically, Plaintiff asserts the following comparators were paid more than her: Jack Thompson, Jeff Wilbanks, Johnny Keel, Donald Bendell, Chad Smith, and Ronnie Lewis. The Court assumes, without deciding, that Plaintiff can establish a prima facie case of discrimination with regard to her pay claims. Defendant asserts that it paid each of the comparators more than it paid Plaintiff because of experience, education, or predicted/planned advancement.

The issue before the Court is whether Defendant's articulated reasons are a pretext for discrimination. Plaintiff contends that Defendant's articulated reasons are pretext; but she does not attack these reasons head-on. She argues with the wisdom of the decisions and not the veracity. Plaintiff's argument that Defendant should have paid the same as her male comparators based on her skills and knowledge is not sufficient to rebut the articulated reasons that Defendant paid the male comparators more based on experience, education, or planned advancement, or to demonstrate that the articulated reasons are a pretext.

Plaintiff has also presented testimony of several managers that they did not know why she was paid less or that they thought she should have been paid more. The record does not show that these managers were responsible for the pay

decisions at issue. Testimony of managers not involved in the employment decision is not substantial evidence that the articulated reason is pretext. "Statements made by a non- decisionmaker . . . are not relevant to the issue of whether a decisionmaker's [articulated] reasons . . . are pretextual." *Fletcher v. ADT Sec. Services, Inc.*, No. 1:99-CV-0504-CC, 2000 WL 33231616, *10 (N.D. Ga. Dec. 7, 2000).

The Court finds that Plaintiff has not presented evidence of a disputed issue of material fact regarding whether Defendant's articulated reasons for paying her less than the male comparators was a pretext for discrimination. Therefore, Defendant's motion for summary judgment as to Plaintiff's Title VII pay claim is due to be granted and such claim is due to be dismissed.

### 2. EQUAL PAY ACT

To establish a prima facie case under the EPA, Plaintiff has the burden at trial to prove that her job and that of a male employee, who is paid more, are substantially equal. *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998); *Miranda*, 975 F.2d at 1533. Plaintiff does not have to prove, however, that the employer actually harbored an intent to discriminate against her on the basis of her gender, *see Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991); nor does she need show that she and a male comparator actually have the same skills or qualifications as individuals, *see Arrington*, 139 F.3d at 876 (citing *Miranda*,

975 F.2d at 1533), to establish a claim under the EPA. Rather, the focus at the prima facie stage is upon the primary duties of the jobs at issue -- as opposed to duties that are merely incidental or insubstantial -- and the demands the jobs impose with regard to skills, effort, responsibility, and working conditions. *Id.*; *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). While formal job titles and job descriptions are relevant to the inquiry of whether job content is substantially equivalent, they are not dispositive. *Arrington*, 139 F.3d at 876; *Miranda*, 975 F.2d at 1533.

Once Plaintiff establishes a prima facie case as applied to even one male comparator, the only way for Defendant to escape liability is to prove, as an affirmative defense, that the wage differential is justified by one of four exceptions set forth in the EPA. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). Those exceptions are: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "The [employer's] burden is a 'heavy one,' because . . . 'defendants must show that the factor of sex provided *no* basis for the wage differential.'" *Irby*, 44 F.3d at 954 (quoting *Mulhall*, 19 F.3d at 590)(emphasis in *Mulhall*). If the employer fails to meet this burden, the court must enter judgment for the plaintiff. *Id.* If, on the other hand, the employer overcomes its burden, "the plaintiff must rebut the explanation by showing with affirmative

evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Id*.

Defendant offers the same reasons for its pay decisions for the comparators as it relied upon for its argument related to the Title VII claims. The Court finds that the evidence is sufficient to carry its burden on summary judgment as to its affirmative defense. *See Id.* at 956-57. Plaintiff offers nothing in addition to the evidence discussed above to demonstrate a disputed issue of fact as to whether Defendant's reliance on factors other than sex is pretextual or offered as a post-event justification for a gender-based differential.

Therefore, the Court finds that Defendant's motion for summary judgment is due to be granted and Plaintiff's EPA claim is due to be dismissed.

### 2. DEMOTION/DISCHARGE

The Court finds a disputed issue of material fact as to whether Plaintiff was demoted and discharged[1] because of her gender and/or in retaliation for her

---

[1] The Court notes, but does not decide, that an issue of fact exists as to whether Plaintiff was terminated, *see Thomas v. Dillard Dept. Stores*, 116 F.2d 1432, 1434 (11th Cir. 1997), or whether she was constructively discharged, *Buckley v. Hospital Corp. of America, Inc.*, 758 F.2d 1525, 1530-31 (11th Cir. 1985); *see also Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)("To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. . . . Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction

engaging in protected activity and that Defendant is not entitled to judgment as a matter of law. Therefore, Defendant's motion for summary judgment is due to be denied as to Plaintiff's discrimination and retaliation claims related to her demotion, discharge, and/or constructive discharge.

### 3. TERMS AND CONDITIONS

In her complaint, Plaintiff alleges she suffered disparate treatment in the terms and conditions of her employment based on her gender. Doc. 1, p.4. Plaintiff has abandoned this "terms and conditions" claim on motion for summary judgment. *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994). Therefore, Defendant's motion for summary judgment is due to granted and Plaintiff's "terms and conditions" claim is due to be dismissed.

### CONCLUSION

As set forth above, the Court finds no disputed issues of material fact as to Plaintiff's EPA and Title VII pay claims and her Title VII "terms and conditions" claim, and that Defendant is entitled to judgment as a matter of law as to these claims. However, the Court finds disputed issues of material fact with regard to Plaintiff's

---

in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.").

demotion, termination, and/or constructive discharge claims and that Defendant is not entitled to judgment as a matter of as to these claims. Thus, based on the foregoing, Defendant's motion for summary is due to granted in part and denied in part.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

DONE this 13th day of May, 2002.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE